# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 21-1429V

|  |  |
|---|---|
| WILLIAM PISTULKA,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: June 27, 2025 |

*Leigh Finfer, Muller Brazil, LLP, Dresher, PA,* for Petitioner.

*Alexa Roggenkamp, U.S. Department of Justice, Washington, DC,* for Respondent.

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On June 3, 2021, William Pistulka filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a shoulder injury related to vaccine administration ("SIRVA") resulting from an influenza ("flu") vaccine received on October 2, 2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

The parties were unable to resolve the claim on their own, and have now fully briefed entitlement and damages (ECF Nos. 37-39). For the reasons described below, I find that Petitioner is entitled to compensation, and award of damages in the amount of **$30,000.00 for actual pain and suffering.**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

## I. Factual Evidence

### A. Medical Records

Petitioner received the vaccine alleged as causal on October 2, 2020, during a visit to his primary care provider - certified nurse practitioner ("CNP") Diane Kenkel. Ex. 1 at 1; Ex. 2 at 19. The vaccination record lists the situs as "R Delt," meaning right deltoid, although Petitioner maintains it was administered in his *left* shoulder. *Id.*

Just over a month later (November 6, 2020), Petitioner returned CNP Kenkel for a medication check. Ex. 2 at 12. The visit focused on his sleep, appetite, and stress levels. *Id.* The record does not mention shoulder pain, and no musculoskeletal examination was done. *Id.*

However, 13 days after that (November 19, 2020), Petitioner returned to CNP Kenkel complaining of left shoulder pain after a flu shot. Ex. 2 at 8. His pain ranged between two and ten out of ten, and "seemed to start soon after his flu shot." *Id.* His job involved lifting boxes of different sizes and weights, which had become difficult due to his shoulder pain. *Id.* On examination, his left shoulder motion was "abnormal," with painful active and passive motion. *Id.* at 10. He was offered referrals to orthopedics and physical therapy ("PT"). *Id.* at 11.

On November 25, 2020, Petitioner attended a PT evaluation for left shoulder pain. Ex. 3 at 4. He reported that his pain "started after his flu shot on 10/2/20." *Id.* The vaccine was administered "really high on the shoulder and [he] felt almost immediate pain that shot down his left arm." *Id.* He tried to work and move his arm through the pain in hopes that it would go away, but instead it persisted and seemed to be worsening. *Id.* He also complained of numbness and tingling in his thumb and index finger that was constant and moderate; although he did not state which thumb and finger were affected, in the context of this record being for treatment of left shoulder pain, more than likely it involved his left hand. *Id.* He rated his pain as nine out of ten at present; at best, it was zero. *Id.* His left shoulder exhibited reduced strength and positive impingement signs; further special tests were not done due to his "extreme pain and limited ROM." *Id.* Petitioner was assessed as having "signs and symptoms consistent with referring physician's diagnosis of left shoulder pain after flu shot," with pain, loss of range of motion ("ROM"),[3] muscle weakness, and decreased functional mobility. *Id.* at 6.

Petitioner returned for a second PT session on December 3, 2020. Ex. 3 at 10. He had been doing his home exercises, but had not seen an improvement in his shoulder pain. *Id.* He had been trying to rest, but after driving for two hours and his arm was "very sore." *Id.* Due to a high insurance deductible he was considering reducing his PT

---

[3] On examination, Petitioner's left shoulder active ROM was 50 degrees in flexion, 60 degrees in abduction, and 20 degrees in extension. Ex. 3 at 5.

frequency, although he would have new insurance as of January 1, 2021. *Id.* His current pain level was five out of ten, ranging from two at best to nine at worst. *Id.* His ROM was slightly improved, and he was given new exercises. *Id.* at 11. Petitioner did not attend further PT, and was formally discharged on March 8, 2021 because he had not returned in three months. *Id.* at 12.

Petitioner did not seek further treatment for the next several months. Nearly four months after his last PT session (March 31, 2021), he was seen by his chiropractor. Ex. 4 at 15. Petitioner complained of left shoulder pain "post 10.20 flu shot vaccination." *Id.* He reported having gone to PT "5-6 times earlier this year," which did not help. *Id.* He could not comb his hair or shave, and wanted to see if chiropractic adjustments would help with his shoulder motion. *Id.* On examination, Petitioner's left arm could not be raised actively or passively to shoulder height, and attempting to do so caused "severe pain in the injection site high in the deltoid, nearly in the joint." *Id.* The record documents that the chiropractor examined Petitioner's cervical ROM, but does not appear to have examined his shoulder beyond attempting to elevate it. *Id.* His chiropractor performed adjustments, used a massager, and applied Biofreeze. *Id.* at 15-16. The visit diagnoses involved his back, head, and cervical, and thoracic areas, but did not list his shoulder. *Id.*

Petitioner returned to his chiropractor two days later (April 2, 2021), stating that the spinal treatment "had no effect on his L shoulder, which neither of us are surprised." Ex. 4 at 17. However, since his treatment he had slept better and had less neck stiffness. *Id.* His chiropractor performed adjustments, used a massager, and applied Biofreeze. *Id.* Petitioner has not filed further treatment records.

### B. Testimonial Evidence

Petitioner has filed three declarations in support of his claim. Exs. 5, 7, 8. He contests the accuracy of the vaccination record, which states that the vaccine was administered in Petitioner's right deltoid. Ex. 7 at ¶ 3. He explains that on the day of vaccination, he sat in the examination room positioned in such a way that his "right shoulder was not available to receive a vaccination." *Id.*

Petitioner states that he mentioned his left shoulder pain to both the nurse and the nurse practitioner at his November 6, 2020 appointment, but neither recorded his complaint. Ex. 7 at ¶ 5. He told the nurse that he was "still having significant pain in [his] left shoulder from the flu shot." Ex. 8 at ¶ 2. He noticed that she did not type his complaint into the computer or ask further questions, stating only that he would be seen soon. *Id.* During the visit with NP Kenkel, he again mentioned his left shoulder pain. *Id.* at ¶ 3. She responded that joints were difficult to heal and advised him to give it time, and did not record his complaint. *Id.* Petitioner states that this was "emotionally triggering for me" as he has been seeing NP Kenkel for a long time and felt that she had dismissed his complaints. *Id.*

3

## II.   Factual Findings and Ruling on Entitlement

### A.   Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[4] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they "suffered the residual effects or complications of such illness, disability, injury,

---

[4] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

4

or condition for more than 6 months after the administration of the vaccine . . . ." Section 11(c)(1)(D).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs.*, No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen month gap); *Silvestri v. Sec'y of Health & Human Servs.*, No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five month mark.

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

### B.  Parties' Arguments on Entitlement

Petitioner argues that his shoulder pain persisted for more than six months, satisfying the severity requirement. Petitioner's Motion for Ruling on Record, filed Mar. 29, 2024, at *6 (ECF NO. 37) ("Mot."). At Petitioner's March 31, 2021 chiropractic visit – just short of six months after vaccination – Petitioner complained of severe left deltoid pain. Mot. at *6. Two days later, he returned to the chiropractor, complaining that the adjustment at the prior visit had no effect on his shoulder pain – suggesting that the pain persisted at this visit. *Id.*

Although Respondent asserts that Petitioner did not receive treatment for his shoulder pain at either of these chiropractic appointments, Petitioner notes that the spinal adjustments were *intended* to relieve his shoulder pain – but were unsuccessful in doing so. Mot. at *6. Moreover, the severity requirement requires a petitioner to have *suffered* residual effects for more than six months, not received *treatment* for that duration. *Id.* at *6-7.

Concerning the situs of vaccination, Petitioner argues that the only evidence suggesting that the vaccine was administered in his right arm is a computer-generated immunization history, with all remaining evidence supporting a left shoulder situs. Mot. at *7-8. Petitioner asserts that these records, supported by declarations, "are sufficient to outweigh the vaccination record." *Id.* at *8. As to onset, Petitioner asserts that he *did* report left shoulder symptoms at his November 6, 2020 appointment. *Id.* at *9-10.

6

However, even if he did not, his complaints at the November 19th visit "are entirely consistent with a forty-eight hour onset." *Id.* at *10. At that time, as well as at later appointments, he related his pain to vaccination "[w]ithout fail." *Id.*

Although Petitioner reported numbness and tingling in his thumb and index finger, Petitioner asserts that the record preponderantly suggests an injury primarily to his shoulder. Mot. at *11-12. Petitioner views Respondent as reading the Vaccine Act "too narrowly" in asserting that numbness and tingling in his thumb and finger disqualifies his injury from meeting the Table SIRVA requirements. *Id* at *12.

Respondent emphasizes that only Petitioner's chiropractic records suggest that he continued to experience shoulder symptoms beyond December 3, 2020. Respondent's Brief, filed May 29, 2024, at *3-4 (ECF No. 38) ("Resp."). And Respondent asks that I afford these records less weight for two reasons: because Petitioner did not receive treatment for his shoulder at these visits, and "contextually, the records were likely created for the purpose of litigation." Resp. at *4.

Respondent acknowledges that the March and April 2021 records do not expressly document that they were made for purposes of litigation, but argues that there are several indications that suggest they were. Resp. at *4. Respondent proposes that I apply the framework set forth in *Kohl v. Sec'y of Health & Human Servs.*, No. 16-748V, 2022 WL 4127217 (Fed. Cl. Spec. Mstr. Aug. 18, 2022).

In *Kohl*, a special master found that a medical record offered to satisfy the severity requirement was entitled to little weight for several reasons. First, the record itself stated that the petitioner "[n]eeds a statement for her attorney stating she still has decreased range of motion." *Kohl*, 2022 WL 4127217, at *24. Second, the petitioner did not seek treatment for her shoulder at the visit, and did not follow the physician's recommendations. *Id.* Third, at the relevant visit, the petitioner reported having done "PT, massage, and 'everything'" – although the record did not indicate that she had undergone such treatment. *Id.* Finally, the special master noted that the record followed a significant gap of 16 months after the last treatment, and concluded that "[r]eports made much later and for litigation purposes are generally afforded little weight." *Id.*

Respondent asserts that, similar to the *Kohl* petitioner, Mr. Pistulka's 2021 chiropractic visits followed a treatment gap. Resp. at *5. And the chiropractic visits "were close in time to when petitioner's counsel began requesting records, and therefore likely close in time to, or overlapping with, petitioner's retention of counsel." *Id.* Respondent asserts that Petitioner did not receive treatment for his left shoulder at either 2021 chiropractic visit, nor did either record list a diagnosis pertaining to his left shoulder. *Id.* Respondent argues this is significant because at multiple pre-vaccination chiropractic visits where Petitioner complained of *right* shoulder pain, the chiropractor included right shoulder pain as a diagnosis – suggesting that had the chiropractor actually treated

7

Petitioner's left shoulder pain at the 2021 visits, the records would have included a corresponding left shoulder diagnosis. *Id.*

Respondent adds that Mr. Pistulka inaccurately told his chiropractor that he went to PT "5-6 times earlier this year." Resp. at *5. Respondent compares this to the *Kohl* petitioner, who reported treatment that was not found in the record, and argues that the special master in *Kohl* "found that this kind of inaccurate reporting lent 'persuasiveness to respondent's argument' that the record was created for the purposes of litigation." *Id.*

Finally, Respondent notes that Petitioner has filed three declarations, *none* of which address the issue of severity by discussing the length of his treatment, duration of his pain, or his current condition – despite being on notice that Respondent had raised the severity issue in his Report. Resp. at *6. Respondent adds in a footnote that even if I were to find that the chiropractic records document that Petitioner's symptoms continued through April 2, 2021, this would mean that he experienced sequelae for *exactly* six months – not *more than* six months as required by the Vaccine Act. Resp. at *6 n.6.

Respondent maintains his assertion that Petitioner has not established onset of symptoms within 48 hours, that his symptoms were not limited to the shoulder of vaccination, and that his manual labor job may have caused or contributed to his shoulder pain. Resp. at *9. However, he does not elaborate on these contentions in his response to Petitioner's motion, relying only on his Rule 4 Report (ECF No. 32).

Petitioner replies that the circumstances of this case differ from *Kohl*, warranting a different result. Petitioner's Reply, filed June 12, 2024 (ECF No. 39) ("Reply"). Petitioner asserts that the record at issue in *Kohl* did not suggest any lingering symptoms and specifically asked for a statement for the petitioner's attorney. Reply at *2. In contrast, on physical examination, Petitioner's chiropractor noted severe pain in Mr. Pistulka's deltoid, as well as continued limitations in his ability to comb his hair and perform other routine daily activities. *Id.*

Petitioner argues that the treatment gap in *Kohl* was 16 months – compared to less than *four* months here. Reply at *3. And his statement to his chiropractor that he attended PT "5-6 times earlier this year" – while he had actually attended PT twice several months prior – is more akin to an inaccurate recollection of treatment than a false statement. *Id.*

### C. Factual Findings

#### 1. Situs of Vaccine Administration

I find that the record preponderantly supports a finding that the October 2020 flu vaccine was likely administered in Petitioner's left deltoid, despite the administration record (the only document contradicting Petitioner's situs contentions).

Petitioner was seen less than two months after vaccination, complaining of left shoulder pain that began after vaccination. He told the physical therapist that his left shoulder pain started after vaccination, explaining that the vaccine was administered

"really high on the shoulder and [he] felt almost immediate pain that shot down his *left* arm." Ex. 3 at 4 (emphasis added). And Petitioner's testimonial evidence explains that his positioning in the examination room at the time of vaccination made his right arm inaccessible for vaccination. The totality of proof supports Petitioner on this disputed issue.

### 2. Severity Requirement

Although this is a close case, I find that the record supports a finding that, more likely than not, Petitioner experienced residual effects of his shoulder injury for more than six months. The weakness of the evidence on this matter is highly relevant to damages, but does not defeat the claim altogether.

Petitioner paused seeking treatment for his shoulder pain two months after it began. Thereafter, he did not return for formal care until nearly four months later, at which time he complained of shoulder pain to his chiropractor. The chiropractor documented that Petitioner complained of left shoulder pain resulting from vaccination. Although the chiropractor seems to have focused more on examining Petitioner's cervical spine, he did note that attempting to elevate Petitioner's arm to shoulder height elicited "severe pain in the injection site." Ex. 4 at 15. I find that this documents a residual effect of Petitioner's injury that persisted on March 31, 2021. Petitioner returned two days later – April 2nd – stating that the spinal treatment at the last visit "had no effect on his L shoulder." *Id.* at 17. This supports a finding that Petitioner's shoulder pain persisted until April 2, 2021. And I find that, more likely than not, this shoulder pain persisted for at least one more day – which is sufficient to satisfy the statutory severity requirement.

### 3. Onset of Shoulder Pain

The record also preponderantly supports a finding that Petitioner's shoulder pain likely began within 48 hours of vaccination. Petitioner sought care less than two months after vaccination, complaining of pain that he consistently related to that event. He told his physical therapist that he felt "almost immediate pain" down his left arm after the vaccine was administered high on his shoulder.

A treatment delay of under two months does not, by itself, defeat the claim. For SIRVA petitioners often delay seeking care, in hopes that their condition will resolve on its own. *See Brennan v. Sec'y of Health & Human Servs.*, No. 20-1844V, 2023 WL 7162365, at *7 (Fed. Cl. Spec. Mstr. Sept. 13, 2023) ("[A] delay in seeking care does not automatically defeat a SIRVA claim"); *Boyd v. Sec'y of Health & Human Servs.*, No. 19-1107V, 2021 WL 4165160, at *6 (Fed. Cl. Spec. Mstr. Aug. 12, 2021) (finding onset within 48 hours where records of first two post-vaccination visits with primary care provider were silent on shoulder pain, but Petitioner was seen for shoulder pain soon thereafter); *Winkle v. Sec'y of Health & Human Servs.*, No. 20-485V, 2021 WL 2808993, at *4 (Fed. Cl. Spec. Mstr. June 3, 2021) ("[i]t is common for a SIRVA petitioner to delay treatment, thinking

his/her injury will resolve on its own" and finding that the onset of the petitioner's pain occurred within 48 hours of vaccination despite a five month delay in seeking treatment).

In this case, Petitioner's intervening November 6th visit to CNP Kenkel, which does not document that he complained of shoulder pain, raises some concern. However, I find that this record alone does not defeat his claim. That November 6th visit was a medication check, not a comprehensive evaluation. Petitioner returned to CNP Kenkel just *13 days* later complaining of shoulder pain. And Petitioner has asserted that he *did* complain of shoulder pain at the November 6th appointment, and that CNP Kenkel dismissed his complaints, telling him to give it time to heal. This combination of evidence does not defeat a favorable onset finding.

### 4. Pain Limited to Shoulder

I find that Petitioner's pain was limited primarily to his shoulder, satisfying the third QAI. Although he reported numbness and tingling in his thumb and index finger, his symptoms *primarily* occurred in, and originated from, his vaccinated shoulder. *See Valdez v. Sec'y of Health & Human Servs.*, No. 21-0394V, 2024 WL 1526536, at *6-7 (Fed. Cl. Spec. Mstr. Feb. 28, 2024) (finding third QAI satisfied despite pain radiating to upper arm and forearm because the petitioner *primarily* experienced a shoulder injury consistent with SIRVA); *Cross v. Sec'y of Health & Human Servs.*, No. 19-1958V, 2023 WL 120783, at *7 (Fed. Cl. Spec. Mstr. Dec. 2, 2022) ("claims involving musculoskeletal pain primarily occurring in the shoulder are valid under the Table even if there are additional allegations of pain extending to adjacent parts of the body, since the essence of the claim is that a vaccine administered *to* the shoulder *primarily* caused pain there") (emphasis in original). However, pain or treatment associated with Petitioner's thumb and finger symptoms cannot be factored into his damages award.

### 5. Other Condition or Abnormality

I previously cast doubt on Respondent's suggestion that Petitioner had not shown that he had no other condition or abnormality that may have caused his shoulder pain due to his job involving manual labor and heavy lifting. Scheduling Order, issued March 1, 2024, at *3 (ECF No. 34). I reasoned that Respondent's position failed to address how Petitioner's job *would explain* his shoulder pain that began after vaccination, adding that it was "not clear that a job involving heavy lifting is the sort of 'condition or abnormality' referred to in the SIRVA QAI." *Id.* Thus, I stated that these objections were "not likely to carry the day." *Id.* In response, Respondent has maintained his position, but not elaborated on it or responded to my concerns.

I find that Petitioner's job involving manual labor and heavy lifting is *not* itself an other condition or abnormality that would explain his symptoms after vaccination. The record indicates that Petitioner's shoulder pain began after vaccination. As such, his work would not explain why his pain began after vaccination.

10

### D. Factual Findings on Remaining SIRVA QAI Criteria and Statutory Requirements

Petitioner's ability to meet the remaining statutory and SIRVA requirements is not disputed, and I find that they are preponderantly satisfied. His shoulder ROM was limited, and the record does not contain preponderant evidence that Petitioner had a history of left shoulder pain that would explain his post-vaccination symptoms. Ex. 2; Ex. 3 at 6.

Petitioner received a covered vaccine in the United States. Ex. 1 at 1. And he states that he has never received an award or settlement for his vaccine injuries or filed a civil action. Ex. 5 at ¶ 6. Thus, Petitioner is entitled to compensation.

### III. Damages
#### A. Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section I-II of *Timberlake v. Sec'y of Health & Human Servs.*, No. 20-1905V, 2025 WL 721730 (Fed. Cl. Spec. Mstr. Feb. 19, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00," in addition to certain unreimbursable expenses resulting from the vaccine-related injury. Section 15(a)(1), (a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[5]

#### B. Parties' Damages Arguments

Petitioner proposes a pain and suffering award of $52,500.00, citing decisions in *Welch* and *Couch*.[6] Mot. at *15-17. Petitioner asserts that his injury is unique, in that he underwent minimal treatment but had severe pain. *Id.* at *16. He treated conservatively,

---

[5] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[6] *Welch. v. Sec'y of Health & Human Servs.*, No. 18-660V, 2021 WL 4612654 (Fed. Cl. Spec. Mstr. Sept. 2, 2021) ($55,000.00 pain and suffering award), and *Couch v. Sec'y of Health & Human Servs.*, No. 20-1246V, 2022 WL 4453921 (Fed. Cl. Spec. Mstr. Aug. 24, 2022) ($55,000.00 pain and suffering award).

with minimal PT. *Id.* He argues that he sought treatment sooner than the *Welch* and *Couch* petitioners, and that his pain ratings and descriptions were more severe. *Id.* However, his overall treatment course was limited by poor medical insurance and high costs. *Id.*

Respondent does not provide a proposed pain and suffering award, instead asking that I make "an award consistent with previous very mild cases." Resp. at *10. He adds that the government "routinely proffers cases for less than $35,000.00 when it is clear that damages are worth less than the lowest reasoned pain and suffering awards." *Id.* at *14.

Respondent also argues that *Welch* and *Couch* are not comparable, as the claimants in those cases received significantly more treatment over a longer period of time. Resp. at *14. The *Welch* claimant sought orthopedic treatment, attended six PT sessions, and underwent an MRI. *Id.* at *15. The petitioner in *Couch* was prescribed medication, had an MRI, saw an orthopedist, and received a cortisone injection. *Id.* In contrast, Petitioner's only treatment was two PT sessions. *Id.* at *14. Although he saw a chiropractor twice, Respondent asserts that he did not receive treatment for his shoulder at those visits. *Id.* at n.8. The fact that Petitioner "failed to pursue treatment beyond two sessions of physical therapy indicates that his shoulder pain was not as severe, and therefore [he] should be given a lower award." Resp. at *14 (citing *Mejias v. Sec'y of Health & Human Servs.*, No. 19-1944V, 2021 WL 5895622 (Fed. Cl. Spec. Mstr. Nov. 10, 2021).

### C. Appropriate Compensation for Pain and Suffering

The record best supports a finding that Petitioner experienced a painful injury, which abated relatively quickly, lingering just *barely* long enough to satisfy the statutory severity requirement. The dearth of evidence on residual effects leads me to conclude that Petitioner's symptoms after he stopped PT in December 2020 were mild, suggesting the damages award should be relatively low. Although Petitioner hoped the later chiropractic care might help his shoulder, neither the chiropractor nor Petitioner expected it – suggesting that that these visits were not primarily intended to treat Petitioner's shoulder injury.

I acknowledge that Petitioner stated he would face high costs from treatment due to his health insurance, and that this may have been partially explanatory for the lack of treatment. However, this point is not sufficiently developed to merit reliance on it to bolster damages.

*Welch* is not a good comparable decision. That petitioner treated for nearly a year, undergoing an MRI, consulting an orthopedist multiple times, and attending more PT than Petitioner (six visits). *Couch* is also dissimilar in many regards, involving a much longer injury duration and a petitioner who underwent a cortisone injection and MRI and saw an orthopedist, although she did not attend PT.

I find *Valdez v. Sec'y of Health & Human Servs.*, No. 21-0394V, 2024 WL 1526536 (Fed. Cl. Spec. Mstr. Feb. 28, 2024) (awarding $35,000.00 in pain and suffering) a better comparison. Like the *Valdez* petitioner, Mr. Pistulka did not seek care immediately, but also did not significantly delay seeking treatment, although he sought care sooner. Neither petitioner underwent an MRI or cortisone injection. The *Valdez* petitioner received prescription medicines, and Mr. Pistulka did not; while Mr. Pistulka attended PT, and the *Valdez* petitioner did not. Additionally, the *Valdez* petitioner treated until nearly seven months after vaccination, while Mr. Pistulka's care mostly occurred during a two-week period about two months after vaccination.[7] Based on the record evidence suggesting only mild lingering symptoms after this time, a lower award is warranted in this case.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I GRANT Petitioner's motion for a ruling on the record, and find that Petitioner suffered an injury that meets the definition for a Table SIRVA and is entitled to compensation. I find that $30,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[8]**

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $30,000.00 to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[9]

---

[7] Although Petitioner later consulted a chiropractor, I have found that this was not primarily for his shoulder pain.

[8] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[9] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master